at all accounts for Pamela Davis-McCarty. Counsel? May I please report? Counsel?     accounting action. I am hereby to report that this is an indictment brought by two members of an LLC against the LLC and the third member of the LLC. Defendants appeal from the trial court judgments that total over $5 million. The plaintiffs failed to prove their case. They didn't prove an entitlement to damages or an amount of damages to a reasonable degree of certainty based on the evidence, and therefore defendants are entitled to judgment. Alternatively, the judgment is against the manifest where the evidence and defendants are entitled to a new trial. I'm going to go through the facts briefly just because it's sort of complicated. You need a flow chart. I agree with you. I guess I'll just start with who the parties are. Initially there was a single LLC, CRS, that was formed to build and operate a refrigerated storage unit, and it's one of those giant storage units. Eventually, three interrelated LLCs were formed at the bank's request, and so after that, University was the owner of the real estate, Continental, or CRS, operated the warehouse, and TCB, the defendant, is a member or owner of University along with another investment group that's not part of the appeal. It's undisputed that from the inception of these businesses that MCV or its sole owner, Mark Vandenberg, put significant sums into the LLCs. The payments are shown in Exhibit 1 of our accounting. It's a multi-page document showing the sums that Mark Vandenberg or MCV put into each of the three LLCs and the sums that he took out. On appeal, there's no factual dispute about the sums on Exhibit 1. No one has said or argued that anything in there is improper or wrong. And so the accounting shows that significant worth sums were contributed between the LLCs from the inception, and that there's no evidence of any complaints about this arrangement by plaintiffs, and the plaintiffs didn't invest any sums. Eventually... Was this an accounting action at law or in equity? It's in accounting. Go ahead. It says, Action for Common Law Accounting. So eventually, Continental, who was operating the warehouse, was close to being insolvent, and so Mr. Pluchenik came up with the plan of the sale leaseback. And so, the building would be sold, Continental would lease it back, and the university owned the building, but the proceeds from that sale would be used to bolster the interrelated LLC of Continental. So the plan was that one LLC was going to go to the aid of an interrelated LLC. And so it's undisputed at Trials on Appeal that the reason for the sale was to loan money to Continental. Part of what happened, according to the accounting, reflected in the accounting, is that LaSalle, one of the lenders to Continental, required an assignment of $2.1 million, and one of Mr. Vandenberg's unrelated LLCs used $2 million to make that assignment to LaSalle. And so, the proceeds were used  and that's reflected on page 33 of our brief. It shows that was paid down by CRS, and CRS executed a note. And the remainder of the proceeds went to TCB, through TCB, to MCV or Mr. Vandenberg in the sum of $3.2 million, which was to repay part of the significant sums he had paid. And so the accounting shows that taking into account all the LLCs and all the payments made into the LLCs and received back from Mr. Vandenberg, that overall, he put in $3 million more than he got out, even taking into account the $3.2 million he got from the sale. In that year, each member got a K-1 tax form. The purpose of that is to show gain on real estate. The code says that it's for gain resulting from the sale of real estate and business. And so the way it works is if you're an owner of real estate and you sell it and you make a gain, that gain is taxable. It doesn't matter how you use that gain. So you might get a lot of cash or you might decide to use that gain to pay down debt and not get one penny in cash, but it's still a taxable gain. And so the plaintiffs failed to meet their burden of proof. They failed to establish that they had any entitlement to a distribution or the amount of a distribution. The plaintiffs did not produce any evidence of how the operating agreement worked regarding distributions, and they failed to take into account the loans that MCV had made to TCV reflected in Exhibit 1. So they disregarded credits and they disregarded the operating agreement. And under share and leasing that... I need to go drink a water. Thank you. I was going to offer you one. Thank you. Under share and leasing that case holds that if the parties fail to take into account the operating agreement, fail to take into account proper credits, and just sort of guess at what their damages are, or entitlement to damages, that they are entitled to judgment. Plaintiffs don't really respond to the language of share and leasing, to our argument of share and leasing in their briefs. And so the trial court entered judgment in favor of the plaintiffs and entered judgment in the amount equal to the K-1s. Again, 1231 K-1 gain is gain resulting from the sale of property, use, and business. And plaintiffs didn't provide any evidence that the amount that's shown on the K-1 is equal to the amount of distribution that's owed by an LLC to the member. There is no evidence of that. Not only that, a defense witness, Maurice Devine, testified that the K-1 1231 net gain does not reflect money which should be distributed to a member. That testimony is uncontroverted. And so again, the gain is taxable whether you took cash or you used it to pay off the debt. Here it was used in part to pay off debt to CRSO and to pay off debt to MCB. And the plaintiffs failed to show that under the operating agreement, should debt paid by a member to an LLC, should that debt be paid before distributions are made or not? And should capital contributions be paid before distributions are made or not? The operating agreement is what controls parties and they didn't use the operating agreement to show an entitlement to distribution. And so because they failed to show any evidence of an entitlement to distribution  failed to show any numbers that showed what they were entitled to, the defendants are entitled to judgment. Using the K-1 figure was arbitrary. There's no evidence that the two figures are related at all. The court made a couple errors in her opinion. In awarding the amount equal to the gain showed on the K-1, the court entirely disregarded the payments that were made to reduce CRS debt, which was the plan of the parties and the design of the sale. So the court disregarded those payments. The court disregarded the sums that Mr. Vandiver had paid into TCB and the other LLCs. The court misunderstood some testimony. The trial court said in her opinion that Mr. Pluchenik had testified that the payments to CRS to reduce debt, the court said those payments did not happen. Mr. Pluchenik testified that when he was shown a pre-closing balance sheet, he said rightly, the pre-closing balance sheet doesn't show that those payments were made. But later, after that pre-closing balance sheet, after the closing, the payments were made, and they're reflected again in Exhibit 14, which we have in our brief. So the court erred in her misunderstanding that those payments on the debt weren't made. The court also said that I apologize. The court said that there's no explanation why the assets of one LLC were being used to bolster a different LLC. But that's contrary to all the evidence that that was the plan by the members of TCB. That we would sell the real estate and use it to bolster CRS. That was an agreement by the members of TCB. And so, based on these errors, the judgments against me manifest away the evidence because the court disregarded evidence of the reason of the interrelation between the LLCs and misunderstood that the payments were made when they were. We assert estoppel in unjust enrichment in our brief in response to the plaintiff's demand that they should receive millions of dollars in exchange for their zero dollar investment despite the millions of dollars that MCB or Vandenberg put into the LLCs. They don't respond to that argument of estoppel in unjust enrichment. Plaintiffs argue Mr. Riffle argues on appeal that using the K-1 is logical, but again there's no evidence tying the amount on the K-1 to an amount of a distribution and that's just an arbitrary number. Mr. Plotinik argues that he brought a claim for breach of fiduciary duty and that if there is a breach of fiduciary duty then the burden shifts to the defendants. And that's incorrect for three reasons. First, the case was tried on an accounting theory. The court said that this was an accounting case and that's what was alleged. The only allegation of breach of fiduciary duty is that the defendants had a fiduciary duty to account. And the defendants admit that we have a fiduciary duty to account, we produced an accounting in response to their demand and again they're not disputing the figures that are shown in the accounting on appeal. That raises an important point in my mind. So then is it the person producing the accounting who has the obligation to show that the accounting is accurate? Or is it the duty of the person challenging the accounting to prove that the burden with respect to the validity? Is there any problem with that accounting for its validity? The defendant has the duty to, under Kennedy, the defendant has the duty to produce the accounting and has a fiduciary duty to do so. And then under Kennedy, someone who's seeking a credit has a entitlement. In this case, there's no claim that the accounting is improper or erroneous. That has not been asserted on appeal. So the person in your argument is the other party who's seeking credit for their burden. Correct. Counselor, you have two minutes. Isn't the party who has had or has controlled the records and the venture and along with their fiduciary duty, don't they have the burden to produce the information with regard to the valid accounting? The ones who have the records, the fiduciary duty. I believe they have a fiduciary duty to produce the accounting. And I believe that they comply, the fiduciary duty, by producing the accounting particularly where here no one is challenging what's in the accounting. I think the dispute in the trial court was just the defendant said we didn't agree that Mr. Vandenberg would be repaid before we received a distribution when the sole asset of the LLC was sold. To follow up on that, the party who is seeking credits and so forth, the party seeking the set offs on monies and so forth in this accounting, they have the burden of proving those credits are justified, don't they? Yes, Your Honor. And in this case, your client is the one who is seeking to have the offsets and so forth. Correct. To have a recognition of certain payments and so forth which the trial judge did not find. Correct. We have the duty to show where the funds were used and that duty was complied with. And so the plaintiffs who are seeking a credit against the accounting have the burden to prove that they're entitled to it or that the distribution is being required and the amount of it. If I understand this correctly, Vandenberg in this case claims that he had an oral agreement with the CB to be paid back in full before any distribution was made. Is that a claim? The oral agreement, well, right. That he would be paid back for all of his contributions to the LLCs before there would be sums paid back to the plaintiff. And alternatively, he replied on just enrichment and stocked, that they are stocked after having received the benefits of all those payments from denying that he would be repaid those payments. Well, and with regard to that claim, the trial court found that that was not credible. Is that right? The trial court said that there was no credible evidence regarding the TIF payments. And again, that's not being disputed on appeal that there was something improper with the TIF payments. That's what the trial court said. I don't believe she said that his entire testimony was not credible. And there was, again, no challenge to what's in the account. Thank you very much. Mr. Leone? You're welcome. I understand you'll be taking just five minutes? Yes, I'm going to try to talk very quickly here. First of all, on the last point, the trial court did find that the testimony concerning the oral agreement was not credible. Everything else was reduced to writing, but that oral agreement was not. We have argued that although the defendant has produced this accounting, which starts at page 159 of their appendix, there's several pages, it begins by summarizing the accounting as payments to and from these ventures, basically just referencing a summary of Mark Vandenberg and his business cash. This was an action in accounting against TCB only. It was the defendants that chose to commingle all of these companies, moving money in and out very freely, which is almost identical to what happened in the Tully case that I cited in my brief. They admit they have a fiduciary duty as the keeper of these records, where this accounting clearly shows money in and money out. There's a net positive to Mr. Vandenberg of about $3 million as to TCB only. So you see all of these money in and money out treated as equity, treated as loan, and it was his withdrawal of Mr. Pluchenik testified at trial that the enterprise was over-leveraged, and as a result, they just couldn't survive. Well, that over-leveraging was because of the withdrawal of all this capital. We have submitted that the burden shifts when there is evidence of breach of fiduciary duty, and I think that accounting is very telling. You'll find even there that quite arbitrarily a distribution was made to Mr. Ripple in the amount of $30,000. No explanation. It was just done. Not that that necessarily has a bearing on the amount of the verdict, but it shows the arbitrary in and out, just treating all of these as a personal cash cow for Mr. Vandenberg. It seems understood that whatever capital went into this endeavor was put there by Vandenberg. Yes, that's correct. So the net result after the trial court got done was you have somebody who didn't put a dime in, one of them walks away with $4.5 million, the other one with $3.25 million, and the guy that put all the money in takes it back. That's correct. At trial, Mr. Pluchenik testified that he approached Mr. Vandenberg with this idea that he has a great deal of experience in the refrigerated storage business, and he said, look, if you're the money guy, I can develop this, I can get the business going. In fact, he did that. He testified that the business was going just gangbusters, and they moved into Phase 2 way ahead of when they planned to because of the success of the business. So yes, it was Mr. Vandenberg's input of capital that was to get this business started and keep it going. But to pull it out is pulling the rug out from under the whole thing, and it made the cost of doing business so high, it was just impossible. But again, concentrating on TCB, he took out 3 million more than he put in. These other companies, yeah, there was money in, money out. The TIF money never even went into any of these companies. He just pocketed that personally into one of his other companies, TCB. I hope that answers your question. Do you agree the accounting, the information in the accounting records is accurate? The accounting, as far as we can see, is accurate, but we don't have anything to substantiate beyond those. But there's no question in my mind that the money moved in and out between all of these various LLCs quite freely. I believe that this accounting shows the money in, money out. There's no question. And I think the judge in the trial court found Mr. Vandenberg not to be credible in base your ruling on all of this mingling. The counsel argued about the plan at the end to pay back money into CRS to reduce their indebtedness. Yeah, that was at the very end when the roof was caving in because they just couldn't afford to do business. That was not the plan at the beginning. So, based on this oral agreement, he took all his money out, and I think everything the trial court did was entirely justified. Thank you. Thank you. That's as fast as I can talk. And Mr. Haster? Yes, ma'am. Thank you. You get double the time. I probably will do about what Mr. Leone did, thank you. So, if it pleases the members of the court and the opposing counsel. My name's Scott Haster. I'm from Joliet, and I represent Dan Ripple. Mr. Ripple brought Mr. Vandenberg together. Mr. Ripple had worked for Mr. Vandenberg, who's seated in the courtroom for quite a number of years. He brought the two of them together in what looked like a good business opportunity, and as a result of that, Mr. Vandenberg gave him a 5% interest in this LLC. Most people would think, this is a good thing. I've just picked up 5% of an asset. However, it turned out to be a nightmare for him because basically unbeknownst to him, when Mr. Vandenberg did his business and made the sale of this property, my client essentially had a $768,000 K-1 dumped in his lap, and he owes, as you saw from the record, $180,000 of federal tax on that, and he has a federal tax lien against his house right now. So, what he thought was going to be a good thing kind of turned out to be a disaster for him. He would have been better off taking the 5% of the LLC and saying, I don't want that membership interest. Let me give it back because then he wouldn't have gotten a K-1 for $760,000. He wouldn't owe the IRS $180,000. Justice Schmitt, I did want to follow up a point that you asked Mr. Leone, a question there. I would ask this Honorable Appellate Court to keep in mind that by, and I'm using the term dumping, these K-1s on our clients, Mr. Vandenberg saved himself tax liability on about $5 million. If he, you know, yeah, he put the money in, he's the money man, he treated these things as his own personal sole proprietorships, but by dumping these K-1s on our two clients, he saved income tax on $5 million. If he would have said, I'm the money guy, I get the spoils, you know, he takes all the income, he would have owed tax on $5 million more. So, he really was not doing us any favors in this, by dumping these K-1s on us, he was, you know, he was damaging us, basically. Well, then would a more reasonable, I guess we're trying to figure out the damages of the judgment, would the more reasonable thing be something that's closer to, approximated to tax liability, instead of the amount, just the amount of the K-1, I'm trying to find a rational relationship to the K-1. Sure. Well, the K-1 is the amount that we have to pay tax on, I mean, you're correct on that. As the court well knows, there are times when you get a K-1 from a partnership, whether you're a member of a law firm or whatever, and sometimes you get dollar for dollar, you do get $700 and some thousand dollars. Other times you get some phantom income and you don't get the full amount of the K-1. I guess our point here was that you know, they called Marty Devine, the CPA who did this, to the witness stand, and he gave no explanation really as to how he came up with what he came up with. He just said, well, I looked at the partnership agreement, and I think he meant operating agreement, and I looked at this and I looked at that, and he didn't give any detail whatsoever as to how he came up with the number. So, the only number that I think the judge really came up with, logically, and I said it was logical in my brief, was the K-1, because that's what triggered the income tax. And, again, keep in mind the sale price for this was $63 million, and you've got a closing statement that shows the proceeds of that $63 million going all over, going all over the place. I tried to figure out how if my client had 5%, how Marty Devine came up with $700 and some thousand dollars on the K-1, because if you sit there and say, well, the net after all the expenses was $3.4 million, and that's what Mr. Vandenberg took himself, my client's 5% of that would have been $150,000. And I think the original complaint I filed, I think, sought that. And then I filed an amended complaint as we went along and got discovery and asked, obviously, for more money. But that was really the only evidence that was put before the court as to what the damages were. The only other thing I think what we spent a fair amount of time briefing is the standard of review. We disagree very much with counsel for MCV and Vandenberg that you can somehow use a judgment notwithstanding a verdict here. I think where Justice Carter was going was you hit it on the head. They said there was an oral agreement that Ripple and Pluchenik agreed that this building would be sold and such. The judge decided that there was no oral agreement and she weighed the credibility of the witnesses. And we believe the standard of review is pretty important in this case because it's then manifest weight. And if it's manifest weight, then you've got to find she had almost no basis whatsoever to do what she did. So we do think the standard of review is a very important issue in this case. But that would be about everything that I have to say to members of the panel, unless you have anything else that you want to ask. Thank you. Thank you very much. Ms. Gorkowski? Do you want to bring your water with you this time? Yes. Justice Carter, you're correct that Judge Petrangaro said that there is no credible evidence that Mr. Pluchenik or Mr. Ripple knew that Mr. Vandenberg was keeping the distribution from the sale. Our theory is our first establishment is a non-just enrichment. We aren't exactly trying to prove an oral agreement. I don't believe that that is what our affirmative defense has relied on. And our argument is first, going back to the judgment that her conclusion is not supported by the evidence. And so that conclusion that the parties weren't aware that Mr. Vandenberg was going to be reimbursed, that ignores the contributions that he made just to TCB. Even if you ignore that there's three interrelated LLCs that operated together from the inception and that everybody knew that they were together. Everybody knew Mr. Vandenberg was plowing a lot of money into it. But that conclusion ignores that he put $1.4 million into TCB itself. And some of the things to say, well, they agree that the accounting is correct. It shows that he made payments, for example, for Mr. Plutonik's salary of $12,000 a month. It's in the accounting. Mr. Plutonik could dispute a lot of the things that are in there if he chose to. They're not disputing it. So those payments were made. And so to conclude, well, there's no agreement that it would be paid back, is disregarding how LLCs are run. Well, nobody is saying that there's no agreement he wouldn't be paid back. The question is kind of priority. In other words, does he get paid back if there's a distribution? Does nobody get anything else until he's made whole based on his contributions? That's a different thing from saying that they didn't think he was going to get paid back. That's correct. And that would be controlled by the operating agreement. Should loans made by a member be paid back before there's a distribution when assets come in? That's controlled by the operating agreement. That was the plaintiff's burden of proof to show that they should receive a distribution before he was paid back. They have the burden of proof as a claimant. The judgment is against manifest evidence also because $3.2 million went to TCB and the judgment is for over $5 million. So she's requiring them defendant to repay more than was received after everything was paid down according to exhibit 14. So after all that CRS debt was paid, after the existing mortgage was paid, $3.2 million went to TCB and then to Vandenberg. The judgment's for over $5 million. It's not related. The K-1s are arbitrary numbers. The judge relied on the written operating agreement of the TCB, right? I don't believe that there's any reference in her opinion to what the controlling provisions are. Was that required to any distribution that was made to the company to be paid to the members based on their racial interest? The percentage interest of ownership, right? The operating agreement, I think it's provision 6.3, and it's a very complicated arrangement, and it talks about negative capital balances and stuff. That was not used or applied by the plaintiffs in saying that we are entitled to a distribution before funds are repaid. They didn't use the operating agreement except to say, well, distribution should be based on percentage, which is right, but it doesn't say how do we get to a distribution and when is a distribution required. What agreement do you point to for distribution and the prioritizing? 6.3. We talk about it in our brief. Would it be in the operating agreement 6.3 of TCB? If that's incorrect, I'll send the supplemental authority to give you the right number and the reference to it. It's a very complicated provision. You're talking about a section of the operating agreement. For TCB, correct. It's also against the manifest way the evidence that the plaintiffs weren't aware that the payments would be repaid. They should not be stopped from demanding that they be paid before those are repaid because of the benefits that they receive. We argued a staple in our brief and the plaintiffs didn't respond. What benefit did Ripple receive? I'm not sure there's anything in the evidence about the benefit Ripple received. I'm not sure there's any evidence that he was paid a salary or that he would be unjustly enriched. We also argued if he were to receive sums before our significant outpay was paid back. How would he be unjustly enriched to get some money to pay this $180,000 tax liability that was visited? If Mr. Vandenberg put $3 million more into the LLC's then he got back. Then he has a deficit also. He has a deficit from the K-1 also. His K-1 showed $9 million. There really was no profit to be distributed. Would you agree that what happens to Mr. Vandenberg in that regard is kind of not directly related to whether, if we're going to use the theory of unjust enrichment, what happens to this person over here really has no bearing on whether this person, Mr. Ripple, for example, is unjustly enriched? Well, I guess I would say that it's unjust enrichment. Unjust enrichment wouldn't necessarily look at I lost $3 million and you were going to lose $180,000 or your tax liability. And I think the tax liability is that's not really, there's not strong evidence of that. I mean, we also know that there were losses that the corporation had. We don't really know, overall, if the losses could outweigh the benefits. I mean, the gains. And so that, we are just looking at one tax year. We're not looking at the whole all the years that those corporations were in existence. I think that that's also an arbitrary number, not based on the evidence. Thank you. Thank you very much to all of you. We will be taking the matter under advisement. Usually, I indicate the decision will be rendered without undue delay, but I have a feeling that this decision may take a while to resolve. So be patient with us as we pour through the record. For now, we're going to stand and recess for a panel check.